## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
## PANAMA CITY DIVISION

FRANK A. DEPINTO,

     Plaintiff,

v.                                  Case No.  5:20-cv-11-RH/MJF

ROBIN SHADER,

     Defendant.

_____/

## REPORT AND RECOMMENDATION

In this section 1983 action, Plaintiff alleges that Defendant—the director of the Northwest Regional Library System—violated the First Amendment when on four occasions she induced police agencies to remove Plaintiff from three public libraries in Bay County, Florida, and excluded him from these public libraries. Defendant moves for summary judgment. Doc. 53. Plaintiff filed a response in opposition. Doc. 59. Defendant filed a reply. Doc. 60. Because Defendant is entitled to qualified immunity, the District Court should grant Defendant's motion for summary judgment.[1]

---

[1] The District Court referred this case to the undersigned to address preliminary matters and to make recommendations regarding dispositive matters. *See* N.D. Fla. Loc. R. 72.2; *see also* 28 U.S.C. § 636(b); Fed. R. Civ. P. 72(b).

# I. PROCEDURAL HISTORY

Plaintiff, proceeding *pro se*, commenced this action pursuant to 42 U.S.C. § 1983. He alleges that Defendant Robin Shader ("Shader") violated his First Amendment right to access public libraries. Docs. 1, 34. Shader filed an answer. After the parties conducted discovery, and before Shader filed a motion for summary judgment, Plaintiff filed a preemptive response to a motion for summary judgment. Doc. 54. Thereafter, Shader filed a motion for summary judgment with evidentiary materials. Doc. 52; Doc. 53. Plaintiff then filed an actual response to Shader's motion for summary judgment, as well as three additional responses that were deficient. Docs. 55; *see* Doc. 58 at 2 n.2.

The undersigned issued an order advising Plaintiff that his responses to Shader's motion for summary judgment were deficient under the Local Rules of the United States District Court for the Northern District of Florida. Doc. 58. The undersigned provided Plaintiff one opportunity to file one response in opposition that was compliant with the Local Rules. *Id.* at 4 n.3. The undersigned also informed Plaintiff that unless Plaintiff "moves for and receives approval from the court, he may not file a sur-reply." *Id.* Additionally, the undersigned informed Plaintiff of the Rule 56 standard and his obligation to come forward with sufficient, evidentiary materials to withstand Shader's summary judgment motion. *Id.* at 2-5.

Plaintiff then submitted a memorandum—with evidentiary materials—opposing Shader's motion for summary judgment. Docs. 59, 59-1. Shader filed a reply. Plaintiff filed a sur-reply.[2] Doc. 61.

## II. UNDISPUTED FACTS

The facts below are drawn from the evidence in the summary judgment record and are viewed in the light most favorable to the non-moving party, here Plaintiff.

This action arises from four separate incidents relating to Plaintiff being removed and "trespassed" from three public libraries in Bay County, Florida:

- Count One: Plaintiff's removal from Bay County public library on February 27, 2018[3];

- Count Two: Plaintiff's removal from Panama City Beach public library on November 7, 2019;

---

[2] In addition to Plaintiff's failure to properly seek leave to tender his sur-reply, Shader did not raise new arguments in her reply brief. For these reasons, the undersigned did not consider Plaintiff's improperly filed sur-reply. *First Specialty Ins. Corp. v. 633 Partners, Ltd.*, 300 F. App'x 777, 788 (11th Cir. 2008).

[3] The proper name for this library is "Bay County public library." Doc. 53 at 1 n.1. The undersigned will refer to this library as the "Bay County public library" unless the undersigned is directly quoting from the parties' evidentiary materials.

- Count Three: Plaintiff's removal from Bay County public library on November 11, 2019;[4] and

- Count Four: Plaintiff's removal from Parker public library on December 3, 2019.

Doc. 34 at 5-14; Doc. 53 at 1-2. These three public libraries are part of a larger library system known as the Northwest Regional Library System ("NRLS"). The NRLS is managed by the Bay County Board of County Commissioners. During the relevant period, Shader was the Director of the NRLS, and her office was located at the Bay County public library.

## A.    **The NRLS's Code of Conduct**

During the relevant period, the NRLS had a code of conduct that was accessible to its patrons, including Plaintiff. Doc. 52-2 at 1; *see* Doc. 52-1 p. 20 lines 12-21.[5] Plaintiff was aware of the NRLS's code of conduct and the type of conduct that was prohibited. Doc. 52-1 p. 20 lines 12-21. Specifically, the NRLS's code of

---

[4] Shader notes that there is no record of a trespass occurring on July 11, 2019. Doc. 53 at 2. Plaintiff does not dispute this. Doc. 59. A trespass order, however, was issued on November 11, 2019, and Shader states that "it is believed that Plaintiff is referring to [this] trespass order." *Id.* (citing Doc. 52-1, page 25 lines 5-11).

[5] Shader did not provide the full transcript of Plaintiff's deposition. Citations to the page number, therefore, represent the number that is located on the top right side of the deposition transcript, rather than the page numbers that were assigned by the court's electronic docketing system.

conduct prohibits "[a]ny behavior that is disruptive to Library use." Doc. 52-2 at 1. Among other things, it prohibits:

- noise or talking which disturbs others;

- use of threatening or vulgar language;

- behavior that creates a hazard to the health/and or safety of Library patrons or interferes with Library personnel or public use of Library resources;

- harassment; and verbal, visual, or physical abuse of other Library patrons or staff;

- fighting;

- improper use, destruction, theft or attempted theft of property; and

- refusing or ignoring a staff member's request.

*Id.*

## B.    Events Precipitating the February 27, 2018 Exclusion of Plaintiff

Beginning in 2014, Plaintiff regularly visited the various libraries within the NRLS to access newspapers, DVDs, books, legal resources, and computers. Doc. 52-1 p. 64 line 25 to p. 65 line 3.

From 2014 through February 27, 2018, the NRLS library staff, including Shader, documented their concerns regarding Plaintiff's conduct towards staff and patrons. Specifically, starting in April 2014, a reference librarian, Darby Syrkin, wrote a letter to Shader regarding Syrkin's interactions with Plaintiff. Doc. 52-7 at

13. Syrkin noted that Plaintiff was argumentative and demanding during staff interactions, and Syrkin personally experienced Plaintiff's argumentative and demanding behavior. *Id.*

A few months later, in September 2014, Lynn Elliot—who is in charge of reference and information services at the Bay County public library—wrote an incident report after she defused a confrontation between Plaintiff and a teenage patron. *Id.* at 25-26. Elliot noted that Plaintiff yelled at the teenage patron because the patron said something that offended Plaintiff. *Id.* at 26. Plaintiff demanded that Elliot call the police, but Elliot declined.

In January 2016, Shader drafted an incident report regarding Plaintiff and another library patron, George Betsey. *Id.* at 1. Plaintiff and Betsey previously had encountered each other outside the library, and Plaintiff had been carrying a stick inside the Bay County public library as "protection" from Betsey. Doc. 52-1 p. 69 lines 23-25 to p. 70 line 1; Doc. 52-7 at 1-2. Shader was concerned about how Plaintiff might act if Plaintiff saw Betsey in the library. Doc. 52-7 at 1. Shader asked the NRLS security officer to speak to Plaintiff regarding his conduct. *Id.* In response to Shader's concerns, Plaintiff wrote a letter to Shader informing her that he would not bring the stick into the library because he had obtained pepper spray, which he would "have ready" in case Plaintiff saw Betsey in the library. *Id.* at 2.

In February 2016, Plaintiff had altercations with other library patrons over the noise level in the Bay County public library's computer lab. Doc. 52-7 at 9-12. After Plaintiff wrote a letter to Shader regarding the noise in the computer lab, Shader met with Plaintiff and reminded him that he should not confront other patrons directly. *Id.* at 9-10. Shader also reminded Plaintiff that he should contact library staff about rule violations and that he should not argue with the library staff over their decision regarding noise level. *Id.* In response, Plaintiff raised his voice and became argumentative with Shader. *Id.* Shader advised Plaintiff that if he continued to argue with staff or other customers, he could be removed from the library. *Id.* at 10.

In October 2016, Plaintiff filed a complaint against two librarians who worked at the Bay County public library. Doc. 52-7 at 21-23. Samantha Hudson, one of the librarians involved, also sent an email to Shader explaining the situation. Plaintiff asked librarian Khelsea Rantanen to permit him to use one of the two research computers and scanners in the library. *Id.* at 21-22. When Rantanen did not immediately accede to Plaintiff's request, Plaintiff began repeating his request and, according to Hudson, acting aggressively toward Rantanen. *Id.* at 21-23. Hudson intervened to deescalate the situation. After Plaintiff had been permitted to use one of the computers, he returned to the reference desk to confront Hudson. When Hudson advised Plaintiff that he could not act aggressively towards library staff, he raised his voice saying, "You're a liar, that's bad customer service, you can't talk to

me that way." *Id.*; Doc. 52 at 23 (noting that Plaintiff went back to the reference desk to confront Hudson and tell her the "truth about her malicious accusation").

In March 2017, Plaintiff wrote a letter to Shader explaining that he had two negative interactions with Rantanen. Doc. 52-2 at 16-17. According to Plaintiff, on or about March 19, 2017, he fell into one of Rantanen's "ego trap[s]." *Id.* at 17. Plaintiff advised Rantanen that he had used the computer and scanner, and Rantanen indicated she had already logged that information.[6] Because Rantanen did not thank him, Plaintiff felt like an idiot. *Id.*

Later that same week, on March 22, 2017, Plaintiff requested to use the staple remover. *Id.* at 16. Plaintiff became "infuriated" when Rantanen paused in her conversation with Plaintiff, which Plaintiff felt was a "sadistic," "contrived," personal attack on Plaintiff in order to make him say "please." *Id.* Plaintiff proposed that Shader instruct Rantanen to not "approach [Plaintiff] again, unless absolutely necessary." *Id.* at 17.

The following month, on April 23, 2017, Plaintiff had an altercation with librarian Laura Moree, because Plaintiff left his personal items unattended in the library. Doc. 52-2 at 18. Moree attempted to explain to Plaintiff that he could not

---

[6] On a prior occasion, Rantanen asked Plaintiff if he had used the computer or scanner. She indicated that one of the other librarians sometimes forgot to complete appropriately the library's log.

leave his personal items unattended because it created a security risk, but Plaintiff found this to be "harassing." Doc. 52-1 p. 76 lines 8-16. Plaintiff became frustrated with Moree, pointed his finger at her, and told her to leave him alone. Doc. 52-2 at 18.

On April 24, 2017, another incident occurred between Plaintiff and Bay County public library staff. *Id.* at 19-20; Doc. 52-3 at 4-5. Plaintiff mistakenly believed that he had been awarded a book as a prize for winning a contest. Doc. 52-2 at 19; Doc. 52-3 at 5. But the book was a library book and part of a display that Rantanen had set up in the library. Doc. 52-3 at 5. While checking out other items, Plaintiff showed the book to Alexandra Arnold, who was working at the circulation desk. Doc. 52-2 at 19; Doc. 52-3 at 5. Arnold determined that the book actually was a library book, and she asked Plaintiff for the book so she could check it out for him. Doc. 52-3 at 5. Plaintiff, however, put the book in his bag and refused to take it out again when Arnold requested that he do so. *Id.*; Doc. 52-2 at 19. Arnold let Plaintiff leave the library and immediately contacted Rantanen to confirm that the book was a library book. Doc. 52-3 at 5.

After Rantanen confirmed that the book was a library book, she and Arnold left the library to retrieve the book from Plaintiff. After they called to Plaintiff, Plaintiff turned around, walked towards them in an agitated manner, removed the book from his bag, "thrust the book" into Rantanen's hand, waved his arms

frantically, and yelled at the staff as they attempted to explain the misunderstanding. Doc. 52-3 at 5; Doc. 52-2 at 19-20. As a result of this interaction, Plaintiff returned to the library and asked to speak to Shader. Doc. 52-3 at 4. Shader agreed to discuss the incident in her office.

While Plaintiff and Shader were discussing the incident, Plaintiff raised his voice to Shader and became "very agitated." *Id.* Shader advised Plaintiff that he was behaving in a threatening manner and warned Plaintiff that if he continued to act in a threatening manner towards staff or patrons, he could be removed from the library. *Id.* She also noted that there were "several prior incident reports on file regarding" Plaintiff. *Id.*

In September 2017, Rantanen wrote two incident reports regarding Plaintiff. First, on September 19, 2017, Rantanen heard loud voices in the library. She found Plaintiff and another customer in a heated argument, which escalated into threats of violence. Doc. 52-7 at 24. Rantanen deescalated the confrontation. *Id.*

Second, on September 22, 2017, Plaintiff left his prescription medication unattended on a library table. Doc. 52-3 at 10-11; Doc. 52-1 at pp. 28-30. Rantanen advised Plaintiff that leaving prescription medication unattended created a safety and health hazard for patrons and staff, and that this was a violation of the NRLS's code of conduct. Doc. 52-3 at 10. After Rantanen asked Plaintiff not to leave such items unattended, Plaintiff "angrily declined and ignored [the] request." *Id.* Plaintiff

subsequently wrote a letter accusing Rantanen of "following him and causing problems" because she had a "psychotic obsession" with Plaintiff. *Id.* at 10-11.

On February 19, 2018, law librarian Carol Hoots was assisting Plaintiff in the law library at Bay County public library. *Id.* at 1. While discussing his frustration with the legal system and the progress of his civil lawsuits, Plaintiff stated that individuals in the legal system were evil. He also indicated that he could get access to firearms and that he would be justified in shooting judges and lawyers. *Id.* at 2; Doc. 52-4 at 4; *see* Doc. 52-2 at 3 (confirming that Plaintiff stated that he "felt like getting a gun and shooting them" and that these feelings "were justified"). This statement was overheard by at least two other librarians. Doc. 52-1 p. 37 lines 22-25 to p. 39 lines 1-3; Doc. 52-3 at 3; Doc. 52-4 at 4.

Although Hoots asked him to refrain from making such statements, Plaintiff disregarded Hoots's instructions and repeated his statement that he would be justified in shooting judges and lawyers. Doc. 52-3 at 2-3; Doc. 52-4 at 4. He then indicated that he would not shoot judges and lawyers but would instead file lawsuits. Hoots reported Plaintiff's statements to security because his "threatening, consecutive statements were disconcerting." Doc. 52-3 at 2. The security guard called the Panama City Police, who interviewed Plaintiff. Although Plaintiff stated that he did not intend to shoot anyone, Plaintiff conceded that he "understood how his comments could be seen as a threat." Doc. 52-4 at 3.

On February 27, 2018, Plaintiff went to the Bay County public library after he attended a city council meeting regarding the Panama City marina. Doc. 34 at 7 ¶ 26; Doc. 59-1 at 7-8. While Plaintiff was at the library, the Panama City Police Department issued a trespass warning to Plaintiff because of the statements Plaintiff made on February 19, 2018, regarding shooting judges and lawyers. Doc. 34-1 at 1; Doc. 52-1 pp. 35-39; Doc. 52-3 at 1-3; Doc. 52-4 at 7-9. Plaintiff was precluded from entering the library premises for approximately one year.

On March 13, 2018, Plaintiff emailed Shader and Jennifer Shuler—the former deputy county attorney for Bay County. In the email, Plaintiff confirmed that he had made statements to the effect that "he felt like getting a gun and shooting" individuals. Doc. 52-2 at 3. From March 2018 through May 2018, Plaintiff continued to email Shader, Shuler, and other Bay County Staff, regarding these statements. In addition to being riddled with abusive language, Plaintiff's emails mentioned that the library staff "had all the guns," and asked, "who pulled the trigger" and who was "the trigger person." *Id.* at 8, 13-14; Doc. 52-3 at 5-6; Doc. 52-8.

## C.    <u>Events Precipitating Further Exclusion of Plaintiff</u>

On October 3, 2019, after Plaintiff used the Panama City Beach public library, two librarians at that library filed incident reports regarding their interactions with Plaintiff. Doc. 52-5 at 1-3; *see* Doc. 52-1 p. 43 lines 16-25. In the Panama City Beach public library, there is only one restroom for men. Doc. 52-1 p. 45 lines 2-14. A

patron advised librarian Sharron Hill that the men's restroom door was locked. Doc. 52-5 at 1. Hill asked the patron to knock on the door, and the patron responded that that no one answered in response to knocking. *Id.* Because it appeared that the door may have inadvertently locked without a customer inside, Hill unlocked the restroom door. *Id.* Plaintiff opened the restroom door and saw—what he believed to be—a staff member running away from the door. Doc. 52-1 p. 46 lines 3-6.

Plaintiff approached Hill and librarian Laura Laspee, and the trio had a meeting in Laspee's office. Doc. 52-5 at 2-3. During the meeting, Plaintiff yelled and pointed his fingers at Laspee and Hill. Doc. 52-1 p. 48 line 25 to p. 49 line 4; Doc. 52-5 at 2-3. Laspee instructed Plaintiff not to shout at her and her staff, but Plaintiff continued to raise his voice and point his finger toward Laspee and Hill. Doc. 52-5 at 1-3. Hill indicated that she was uncomfortable being in the room with Plaintiff, and Laspee reported that Plaintiff was aggressive and his "tone and manner of pointing his finger and shouting"—after she repeatedly asked him not to shout— was "threatening" to herself and Hill. *Id.* at 1, 3. Laspee reported that she felt "shaken up for the remain[der] of [her] shift and evening." *Id.* at 2.

A patron who observed Plaintiff's interactions with Hill and Laspee approached librarian Kyle Polk. The patron stated that it was not "right for [Plaintiff] to be upset," that it was "not okay to scream at staff for doing their jobs," and that Plaintiff acts "like he owns the place." *Id.* at 4. The patron indicated that if Plaintiff

acted the same way again when the patron was present, the patron would have a fight

with Plaintiff. Doc. 52-5 at 4.

> On October 4, 2019, Shader stated in an email to Shuler:

> The Beach has been having more and more problems with [Plaintiff] lately, and the latest incident has two staff members very upset. . . . The attached reports will give the details, but it boils down to [Plaintiff] simply not being cooperative and shouting and pointing in a threatening manner at staff when they do something he doesn't like. This time a customer implied that he would have a fight with [Plaintiff] if he behaved like that again.

> [Plaintiff] is threatening, uncooperative, and disruptive. I'd like to have him trespassed from the PCB library. If we cannot do it for this incident then I'd like to do it the next time he behaves this way.

Doc. 59-1 at 13.

> On October 23, 2019, a similar "restroom" incident occurred. Doc. 52-5 at 6.

A library patron alerted librarian Mary Ann Baker that the men's restroom door was

locked. Baker asked the patron if he had knocked on the door, and the patron

indicated that he had. *Id.* at 6, 8. Baker, therefore, knocked on the restroom door and

Plaintiff—from inside the restroom—yelled and cursed at Baker. *Id.* at 6, 8; *see*

Doc. 52-1 p. 51 lines 10-14; Doc. 59-1 at 20 (confirming that the second restroom

incident occurred and noting that Plaintiff used a "loud voice" to "address [the

staff's] perverted acts" of knocking on the bathroom door without identifying

themselves). Plaintiff then exited the restroom and approached Baker to discuss the

situation. Doc. 52-5 at 8. During these interactions the library was open to other

patrons and other patrons generally were able to observe Plaintiff's behavior and actions. *Id.*; *see* Doc. 52-1 p. 52 lines 14-16.

Later that day, Plaintiff confronted Baker a second time about the restroom incident. Doc. 52-5 at 5, 8. Hill observed this interaction between Plaintiff and Baker and noted that although Baker was poised through the interaction, Baker looked uncomfortable. *Id.* at 5. Hill indicated that she was hesitant to assist Baker because she "did not want another confrontation with" Plaintiff. *Id.* Hill described Plaintiff as "very agitated" and reported that she was disturbed by Plaintiff's behavior and demeanor. *Id.* at 5, 6.

On October 29, 2019, Plaintiff was involved in yet another altercation with a library patron. Doc. 52-1 p. 53 lines 8-21; Doc. 52-5 at 9-13; Doc. 59-1 at 21. While Plaintiff and the patron were in the computer room, the patron confronted Plaintiff because Plaintiff was making loud noises as he packed up his belongings. Doc. 52-5 at 10. The argument escalated and Plaintiff and the patron raised their voices.[7] *Id.* at 9-13; Doc. 59-1 at 21. Both Polk and librarian Karen Fleming heard the altercation from the circulation desk. Doc. 52-5 at 10, 13. Polk entered the computer lab to

---

[7] In his deposition, Plaintiff states he was not "yelling," but that he had probably raised his voice and used a "strong voice manner." Doc. 52-1 p. 53 lines 10-21.

defuse the situation.[8] The other patron explained that Plaintiff was disturbing others with his behavior. *Id.* at 13. Plaintiff, however, indicated that he did not understand why the other patron was upset. *Id.* Polk briefly left the computer lab but then returned because he was concerned that Plaintiff and the patron would engage in violence. *Id.* Plaintiff continued to make noise, and staff could hear Plaintiff "slamming things into his backpack" and making as "much noise as possible." *Id.* at 11.

Plaintiff's altercation with the patron disturbed other users of the library. Doc. 52-5 at 11, 13. One library patron—who was not involved in the incident—approached Polk to express his concern about the altercation and note that Plaintiff's behavior was disruptive. *Id.* at 13. Both Polk and Fleming expressed concern that, in addition to being disruptive, Plaintiff's behavior was unsafe. *Id.* at 9. Fleming reported that she experiences "anxiety" when she is required to "deal with" Plaintiff, and Polk felt concerned for the safety of the female library staff members. *Id.*

On October 31, 2019, Polk wore a costume to work for Halloween. Doc. 52-1 p. 56 line 23. The next day, on November 1, 2019, Plaintiff asked Polk if he had

---

[8] Fleming noted that she did not go into the computer lab because she did not feel comfortable intervening in the altercation. She also expressed that she experiences extreme anxiety when dealing with Plaintiff because of his behavior. As a result, she was not comfortable speaking to Plaintiff after the altercation and left the circulation desk to go to "the back room." Doc. 52-5 at 11.

gone out dressed in the costume. *Id.* After Polk responded in the negative, Plaintiff stated that Polk "probably would have gotten shot Trick-or-Treating" wearing that costume. *Id.* p. 56 line 25 to p. 57 line 1. Plaintiff added, "I would have shot you." *Id.* p. 57 line 1. Plaintiff's remarks were overheard by other library staff.

Although Polk did not find Plaintiff's statement funny or amusing, he laughed in order to disengage politely from the situation. Doc. 59-1 at 15. Shader advised Shuler that Polk reported feeling confused and fearful given that Plaintiff had "a history of aggressiveness and provocation in the library." *Id.* He also reported feeling concerned for his safety and the safety of others. *Id.* Shader noted that Laspee felt that Plaintiff's statements were "over the line" and that staff felt uncomfortable around Plaintiff. *Id.*

On November 5, 2019, Hill drafted another incident report because Plaintiff had responded in a confrontational manner when Hill advised Plaintiff to keep the computer-lab door open. Doc. 52-5 at 15. Hill reported that she was physically shaking after this encounter with Plaintiff. *Id.*

On November 7, 2019, the Panama City Beach Police Department removed Plaintiff from the Panama City Beach public library and gave him a trespass warning pursuant to a Panama City Beach ordinance. Doc. 34-1 at 2. Later that same day, Plaintiff went to the Bay County public library. Shader called the Panama City Police and asked that the police to remove Plaintiff from the Bay County public library

because Plaintiff was "causing disturbances in the building and the employees do not feel safe when [Plaintiff] is in the building due to the comments he has made to employees." Doc. 52-6 at 2; Doc. 34-1 at 4. The Panama City Police department removed Plaintiff from the Bay County public library and issued him a trespass warning. Doc. 52-6 at 1-2; Doc. 34-1 at 4-5.

On December 2, 2019, Plaintiff appealed the trespass order from the Panama City Beach public library to the Panama City Beach City Council, and the ordinance trespass was dismissed. Doc. 34-1 at 3. That same day, the Panama City Beach Police Department issued a new trespass order, pursuant to Florida Statute § 810.09, for the Panama City Beach public library. Doc. 52-2 at 1; *see* Doc. 34-1 at 5. Approximately two weeks later, Plaintiff went to the Parker public library. The Parker Police Department removed Plaintiff and gave him a "notice of trespass warning." Doc. 52-2 at 28. Plaintiff also was removed and given a trespass order from the Parker public library because of his behavior. Doc. 59-1 at 5; *see* Doc. 34-1 at 6. As a result, Plaintiff was excluded from the Bay County public library, Panama City Beach public library, and the Parker public library for one year.

### III. STANDARD

Rule 56 of the Federal Rules of Civil Procedure states that a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ.

P. 56(a). A "genuine" dispute exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1260 (11th Cir. 2004). An issue of fact is "material" if it could affect the outcome of the case. *Anderson*, 477 U.S. at 248; *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995).

When addressing a motion for summary judgment, a court must decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Hickson*, 357 F.3d at 1260 (quoting *Anderson*, 477 U.S. at 251-52). At "the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S at 249. A "scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. The judge's inquiry . . . asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict . . . ." *Id.* at 252. In evaluating a summary judgment motion, all "justifiable inferences" must be resolved in the nonmoving party's favor so long as there is a genuine dispute as to those facts. *Beard v. Banks*, 548 U.S. 521, 529 (2006); *see Scott v. Harris*, 550 U.S. 372, 380 (2007).

## IV. Discussion

Defendant asserts that she is entitled to qualified immunity on Plaintiff's claims that she violated his First Amendment right to access public libraries. Doc. 53 at 2, 4, 15-26.

### A.    Qualified Immunity Standard

"Under the qualified immunity doctrine, government officials performing discretionary functions are immune not just from liability, but from suit, unless the conduct which is the basis for suit violates clearly established federal statutory or constitutional rights of which a reasonable person would have known." *Sanders v. Howze*, 177 F.3d 1245, 1249 (11th Cir. 1999) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "To be entitled to qualified immunity, the defendant must first establish that he was acting within the scope of his discretionary authority." *Gaines v. Wardynski*, 871 F.3d 1203, 1208 (11th Cir. 2017) (citing *Maddox v. Stephens*, 727 F.3d 1109, 1120 (11th Cir. 2013)). The parties do not dispute that Shader was acting within her discretionary authority. Doc. 53 at 15-16. The burden, therefore, "shifts to the plaintiff to establish that qualified immunity is not appropriate." *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002).

In resolving questions of qualified immunity, courts engage in a two-pronged inquiry. *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (resolving question of qualified immunity at summary judgment stage) (citing *Saucier v. Katz*, 533 U.S. 194, 201

(2001)). At the summary judgment stage, a court first "asks whether the facts, taken in the light most favorable to the party asserting the injury, . . . show the officer's conduct violated a federal right." *Id.* Then the court "asks whether the right in question was 'clearly established' at the time of the violation." *Id.* If no constitutional violation is established under the first prong, "there is no necessity for further inquiries concerning qualified immunity." *Saucier*, 533 U.S. at 201; *Stanley v. City of Dalton*, 219 F.3d 1280, 1286 (11th Cir. 2000).

**B.**    **Plaintiff Failed to Establish a Violation of the First Amendment and Shader is Entitled to Qualified Immunity**

The First Amendment enshrines America's "profound national commitment to the free exchange of ideas." *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 686 (1989). The First Amendment includes "the positive right of public access to information and ideas." *Kreimer v. Bureau of Police for the Town of Morristown*, 958 F.2d 1242, 1255 (3d Cir. 1992); *see Martin v. City of Struthers*, 319 U.S. 141, 143 (1943) (holding that the First Amendment "necessarily protects the right to receive" information).

"Traditionally, libraries provide a place for 'reading, writing, and quiet contemplation.'" *Neinast v. Bd. of Tr. of the Columbus Metro. Libr.*, 346 F.3d 585, 591 (6th Cir. 2003) (quoting *Kreimer*, 958 F.2d at 1261). In the twenty-first century, public libraries typically also provide access to the internet and the ability to send

and receive email. "By connecting to the Internet, public libraries provide patrons with a vast amount of valuable information." *United States v. Am. Libr. Ass'n, Inc.*, 539 U.S. 194, 200 (2003) (plurality opinion). Because libraries are repositories of information and ideas, they can serve an important function in the transmission and receipt of information. *Stanley v. Georgia*, 394 U.S. 557, 564 (1969); *see Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 867 (1982) (noting the importance of libraries in imparting knowledge); *Brown v. Louisiana*, 383 U.S. 131, 142 (1966) (plurality opinion) (noting that a library is a place dedicated to knowledge).

Because public libraries provide access to vast amounts of information and the ability to transmit information, the First Amendment protects the right to "some level of access to a public library." *Kreimer*, 958 F.2d at 1255; *see Minarcini v. Strongsville City Sch. Dist.*, 541 F.2d 577, 582 (6th Cir. 1976) ("A library is a mighty resource in the free marketplace of ideas."); *Armstrong v. Dist. of Columbia Pub. Libr.*, 154 F. Supp. 2d 67, 75 (D.D.C. 2001) (noting the existence of "long-standing precedent supporting plaintiff's First Amendment right to receive information and ideas, and this right's nexus with access to public libraries"). Indeed, the "right to receive information is vigorously enforced in the context of a public library." *Sund v. City of Wichita Falls*, 121 F. Supp. 2d 530, 547 (N.D. Tex. 2000); *Armstrong*, 154

F. Supp. 2d at 82 (noting that "access to a public library . . . is at the core of our First Amendment values").

This right to access public libraries, however, is limited. *Rihm v. Hancock Cnty. Pub. Libr.*, 954 F. Supp. 2d 840, 855 (S.D. Ind. 2013) (noting that the First Amendment right is not "unfettered and may give way to significant countervailing interests") (citing *Kreimer*, 958 F.2d at 1255). "The existence of a right of access to public property and the standard by which limitations upon such a right must be evaluated differ depending on the character of the property at issue." *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 44 (1983).

A public library is a designated public forum.[9] *Doe v. City of Albuquerque*, 667 F.3d 1111, 1130 (10th Cir. 2012); *Kreimer*, 958 F.2d at 1261; *Lu v. Hulme*, 133 F. Supp. 3d 312, 325 (D. Mass. 2015); *Gay Guardian Newspaper*, 235 F. Supp. 2d at 1368. Because a library is a designated public forum, it is "'obligated to permit the public to exercise rights that are consistent with the nature of the [l]ibrary and consistent with the government's intent designating the [l]ibrary as a public forum'

---

[9] Courts have also used the term "limited public forum" to describe public libraries. *Kreimer*, 958 F.2d at 1261; *Gay Guardian Newspaper v. Ohoopee Reg'l Libr. Sys.*, 235 F. Supp. 2d 1362, 1368 (S.D. Ga. 2002), *aff'd sub nom. Gay Guardian Newspaper v. Ohoopee Reg'l*, 90 F. App'x 386 (11th Cir. 2003). "Although many of these courts used the term 'limited public forum,' they each applied the standard applicable to designated *public fora* in reviewing regulations that restricted permitted expressive activity (reading, writing, and quiet contemplation) in the library." *Doe*, 667 F.3d at 1130.

but 'other activities need not be tolerated.'" *Gay Guardian Newspaper*, 235 F. Supp. 2d at 1336 (quoting *Neinast v. Bd of Trs. of Columbus Metro. Libr.*, 190 F. Supp. 2d 1040, 1043-44 (S.D. Ohio 2002)). "[T]he State, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated." *Perry Educ. Ass'n*, 460 U.S. at 46. Any restriction on the person's First Amendment right to access the library, therefore, must be reasonable, and restrictions cannot be designed to suppress expression based on a viewpoint expressed. *Hunt v. Wise*, No. 8:07-CV-1168-T30TGW, 2009 WL 2163108, at *6 (M.D. Fla. July 17, 2009) (first citing *Brinkmeier v. City of Freeport*, No. 93 C. 20039, 1993 WL 248201 (N.D. Ill. July 2, 1993); then citing *Kreimer*, 958 F.2d at 1242; then citing *Neinast*, 346 F.3d at 592-95)).

To create a genuine issue of material fact regarding a First Amendment claim of exclusion from a public library, a plaintiff must offer sufficient evidence with respect to four elements:

(1) the plaintiff sought to be admitted to or remain in a public library for purposes protected by the First Amendment;

(2) the defendant excluded plaintiff or caused plaintiff to be excluded from the public library;

(3) the defendant's exclusion of plaintiff had a chilling effect on protected speech that was more than merely speculative, indirect, or remote; and

(4) the defendant intended to inhibit the receipt of speech or information protected by the First Amendment.

*Dolan v. Tavares*, No. 10-10249-NMG, 2011 WL 10676937, at *6 (D. Mass. May 16, 2011) (first quoting *Tatro v. Kervin,* 41 F.3d 9, 18 (1st Cir. 1994); then quoting *Sullivan v. Carrick,* 888 F.2d 1, 4 (1st Cir. 1989)); *see Hunt v. Hillsborough Cnty.*, No. 8:07-cv-1168-T-30TGW, 2008 WL 4371343, at *3 (M.D. Fla. Sept. 22, 2008).

If applied reasonably and evenhandedly, a public library's enforcement of a rule against harassment of others or noisy activities does not violate the First Amendment. *Kreimer*, 958 F.2d at 1263 (applying "reasonableness" standard and nothing that "[p]rohibiting disruptive behavior is perhaps the clearest and most direct way to achieve maximum library use"); *Grant-Davis v. Bd. of Trs. of Charleston Cnty. Pub. Libr.*, No. 2:215-cv-2676-PMD-MGB, 2017 WL 9360875, at *22 (D.S.C. May 24, 2017) (dismissing a claim where plaintiff was denied access to library for having violated its rules prohibiting "loud unreasonable, and or disturbing actions" and "[t]hreatening behavior toward another person, either verbally or physically"); *see Lu*, 133 F. Supp. 3d at 327 (noting that rules allowing removal of patrons from misusing the library facilities do no implicate First Amendment concerns as "the prohibited conduct . . . goes beyond the First Amendment purposes to which a public library is dedicated"). Furthermore, a library's "enforcement powers are at their peak when protecting the security of its staff or other patrons." *Van Den Heuvel v.*

*Dorothy*, No. 2:21-CV-2176-TLNCKDPS, 2022 WL 95237, at *3 (E.D. Cal. Jan. 10, 2022); *see Spreadbury v. Bitterroot Pub. Libr.*, 862 F. Supp. 2d 1054, 1056 (D. Mont. 2012) (upholding library's termination of plaintiff's right to access library after he intimidated both library staff and other patrons with his "disruptive" behavior); *Grant-Davis*, 2017 WL 9360875, at *22-23.

Plaintiff has failed to create a genuine issue of material fact with respect to the element that Shader intended to inhibit Plaintiff's use of the library to obtain information or speech protected by the First Amendment. In his complaint, Plaintiff alleged that Shader removed Plaintiff from the Bay County public library without cause and states that Shader fabricated the basis for his removal. Doc. 34 ¶¶ 9, 15. Specifically, he asserts that Shader falsely accused Plaintiff of making threats against attorneys and judges. Plaintiff has failed to submit any evidence which indicates that Shader intended to thwart Plaintiff's ability to receive information protected by the First Amendment. Rather, all of the evidence in the record indicates that Shader was motivated by lawful considerations and applied the library's regulations reasonably.

## 1.    *The Trespass Warning of February 27, 2018*

Prior to February 19, 2018—when Plaintiff mentioned his desire to shoot judges and lawyers—library staff documented Plaintiff's disruptive behavior and his many confrontations with library patrons and staff. Doc. 52-2 at 16-20; Doc. 52-3 at 4, 10-11; Doc. 52-7 at 1-2, 13, 16-26. These include at least eleven instances when

Shader or staff documented Plaintiff's confrontations with other library customers and library staff.

Then on February 19, 2018, Plaintiff discussed his desire to shoot judges and attorneys. There is no dispute that Plaintiff made statements about shooting judges and attorneys. Doc. 52-2 at 3; Doc. 53-3 at 2; Doc. 52-4 at 4. There also is no dispute that Plaintiff's statements about shooting judges and attorneys were heard by at least three library staff members—including Carol Hoots, who was assisting Plaintiff. Doc. 52-3 at 1-3; Doc. 52-4 at 4. Furthermore, Plaintiff does not dispute that Hoots asked him to refrain from using threatening language and that Plaintiff disregarded Hoots instruction by again stating his desire to shoot judges and attorneys. Plaintiff conceded that he "understood how his comments [about shooting judges and attorneys] could be seen as a threat." Doc. 52-4 at 3. The undisputed evidence indicates that Shader sought to preclude Plaintiff from the library in February 2018 because of threats he had uttered and his troubling behavior. Indeed, the trespass warning form informed Plaintiff that the basis of his removal was that he had "show[n] up to the property making threats to shoot unnamed judges and lawyers." Doc. 34-1 at 1; Doc. 52-2 at 3-7. Therefore, all of the evidence indicates that Shader sought to ban Plaintiff from the Bay County public library for a year because of his disruptive and threatening behavior, conduct that is outside the "First Amendment purposes to which a public library is dedicated." *Lu*, 133 F. Supp. 3d at 327.

Plaintiff has not submitted any evidence that suggests Shader intended to preclude Plaintiff from receiving information or otherwise exercise his First Amendment rights. Specifically, Plaintiff did not provide any affidavits, declarations, deposition testimony, or any other relevant evidence that would create a triable issue for the jury that Shader's enforcement of the NRLS's rules prohibiting threatening and disruptive behavior offended the First Amendment.

### 2.    *The Trespass Warnings of November 7 and 11 and December 3, 2019*

Plaintiff also asserts that Shader lacked cause to have Plaintiff removed from the Panama City Beach public library, Bay County public library, and Parker public library in November and December 2019, because Plaintiff did not cause disturbances in these libraries. Doc. 34 at 4 ¶ 9, 9 ¶ 24, 11 ¶ 46, 13 ¶ 60.

With respect to the trespass orders of November and December 2019, the uncontradicted evidence indicates that Shader again was enforcing the NRLS's code of conduct, which prohibits disruptive and threatening behavior. In the incident report attached to these trespass warnings, Shader indicated that Plaintiff should be removed and precluded from entering the NRLS libraries for a period of one year because Plaintiff "caus[ed] disturbances in the buildings and the employees [did] not feel safe when [he was] in the building." Doc. 52-6 at 2.

Plaintiff does not dispute that he was involved in several altercations with patrons and/or staff members prior to being removed on November 7, 2019. Doc.

52-5 at 1-4, 6-13; Doc. 59-1 at 13, 21. Furthermore, it is undisputed that during at least two of these altercations, four library patrons—who were not involved in the altercations—were interrupted by Plaintiff's behavior. Doc. 52-5 at 4, 10-13. Additionally, after many of the encounters with Plaintiff, staff reported feeling "concerned" about their safety and the safety of others. Other staff reported feeling anxious when Plaintiff was using the library because they feared additional altercations. *Id.* at 1-15. Even exhibits that Plaintiff attached to his response to Shader's motion for summary judgment show that Shader was concerned about Plaintiff's disruptive and threatening behavior. Doc. 34-1 at 6 (noting that Shader wanted "to have [Plaintiff] trespassed from all NWRLS locations" because of "repeated violations of the Library Code of Conduct, including being disruptive and acting in a threatening manner towards staff and patrons"); Doc. 59-1 at 13 (Shader indicating that she wanted Plaintiff "trespassed from the PCB library" because he was "threatening, uncooperative, and disruptive").

All of the evidence indicates that in November and December 2019, Shader was enforcing rules that prohibited disruptive and threatening behavior when she sought to have Plaintiff removed and banned from the public libraries. As noted above, "enforcement powers are at their peak when protecting the security of its staff or other patrons." *Van Den Heuvel*, 2022 WL 95237, at *3; *see Spreadbury*, 862 F. Supp. 2d at 1056; *Grant-Davis*, 2017 WL 9360875, at *22-23. Additionally,

enforcing rules that prohibit disruptive and threatening behavior is "perhaps the clearest and most direct way to achieve maximum library use." *Kreimer*, 958 F.2d at 1263.

But even if Plaintiff had established that Shader was at least partially motivated by an improper motive, in mixed-motive cases, "the presence of a jury issue about a defendant's improper intent does not necessarily preclude qualified immunity." *Bogle v. McLure*, 332 F.3d 1347, 1355-56 (11th Cir. 2003). A defendant is entitled to qualified immunity even in a mixed-motive case, if the "record *indisputably* establishes that the defendant in fact was motivated, *at least in part*, by lawful considerations" and pre-existing law does not "dictate the merits of the case must be decided in Plaintiff's favor." *Id.* at 1356 (quoting *Foy v. Holston*, 94 F.3d 1528, 1533 (11th Cir. 1996)); *Jackson v. Humphrey*, 776 F.3d 1232, 1241 (11th Cir. 2015) ("[T]he mixed motive analysis examines whether reasonable officers could anticipate that their actions, based on both lawful and unlawful motives, would result in violation of a clearly established law."); *Stanley*, 219 F.3d at 1297-98. That is, "the existence of an unlawful motive will not defeat qualified immunity so long as the state official would have taken the challenged action pursuant to a lawful reason." *Wall-DeSousa v. Fla. Dep't of Highway Safety & Motor Vehicles*, 691 F. App'x 584, 591 (11th Cir. 2017).

Here the record indisputably establishes that Shader was motivated—at least in part—by lawful considerations. Shader's stated reasons for removing Plaintiff were that:

- Plaintiff showed up to the Bay County public library and made threats to shoot unnamed judges and lawyers;

- Plaintiff caused disturbances in the buildings and the employees did not feel safe when he was in the building;

- Plaintiff engaged in repeated violations of the Library Code of Conduct, including being disruptive and acting in a threatening manner towards staff and patrons;

- Plaintiff was "threatening, uncooperative, and disruptive."

Doc. 34-1 at 1, 6; Doc. 52-2 at 3-7; Doc. 52-6 at 2; Doc. 59-1 at 13. With respect to the 2018 trespass warning, there is no dispute that Plaintiff engaged in disruptive behavior, including twice stating that he felt like—and would be justified in—shooting judges and attorneys. Doc. 34-1 at 1; Doc. 52-2 at 3; Doc. 52-4 at 3. As to the November and December 2019 trespass orders, there likewise is no dispute that Plaintiff caused disturbances at the various libraries. Doc. 52-5 at 1-4, 6-13; Doc. 59-1 at 13, 21. That is, nobody disputes that the incidents underlying the trespass warnings occurred. Accordingly, even if Plaintiff had submitted some evidence which indicated that Shader acted with mixed motives, she is entitled to qualified

immunity because the evidence demonstrates that she would have excluded Plaintiff from the libraries for lawful reasons. *Stanley*, 219 F.3d at 1298.

## V. CONCLUSION

Because Plaintiff has failed to establish a violation of his First Amendment right to access the public libraries, Shader is entitled to qualified immunity. *See Saucier*, 533 U.S. at 201. Therefore, the undersigned respectfully **RECOMMENDS** that the District Court:

1.    **GRANT** Defendant's Motion for Summary Judgment. Doc. 53.

2.    Direct the clerk of the court to close the case file.

At Pensacola, Florida, this <u>6th</u> day of April, 2022.

/s/ *Michael J. Frank*
**Michael J. Frank**
**United States Magistrate Judge**

## <u>NOTICE TO THE PARTIES</u>

**Objections to these proposed findings and recommendations must be filed within fourteen (14) days of the date of the report and recommendation. <u>Any different deadline that may appear on the electronic docket is for the court's internal use only and does not control.</u> An objecting party must serve a copy of its objections upon all other parties. A party who fails to object to the magistrate judge's findings or recommendations contained in a report and recommendation waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions. *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.**